Lindsay C. Herkness and Carlota L. Herkness v. Commissioner.
Herkness v. Commissioner
Docket No. 50606.
United States Tax Court
T.C. Memo 1955-262; 1955 Tax Ct. Memo LEXIS 75; 14 T.C.M. (CCH) 1040; T.C.M. (RIA) 55262; September 27, 1955
*75 Logan Morris, Esq., for the petitioners. Stephen P. Cadden, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent has determined a deficiency in the income tax of petitioners for the calendar year 1949 in the amount of $721,053.10. The sole issue for determination is whether the sum of $1,308,450 received by one of the petitioners in 1949 constituted the price paid for shares of stock in a corporation, as contended by petitioners, or consideration paid for the release of an employment contract, as determined by respondent. If it was in fact the sale price of stock then the payment, appropriately reduced in amount by the seller's basis and expenses of sale, was properly reported as a capital gain. If, on the other hand, such payment was in fact for the release or cancellation of an employment contract the amount thereof would then constitute ordinary income as contended by respondent in his notice of deficiency. Another item in the notice of deficiency has been agreed upon by the parties and may be disposed of in a computation made pursuant to Rule 50. Findings of Fact A stipulation of facts filed by the parties is incorporated by *76 this reference as a part of our findings. The petitioners are husband and wife with residence at Westtown, Pennsylvania. They filed a joint income tax return for the calendar year 1949 with the collector of internal revenue for the first district of Pennsylvania at Philadelphia, Pennsylvania. The income and transactions in question are those of the husband, Lindsay C. Herkness, who will hereinafter be referred to as "petitioner". Charles Eneu Johnson and Company (hereinafter called "Pennsylvania") was a corporation organized under the laws of the Commonwealth of Pennsylvania on July 23, 1883. It was at all relevant times engaged in the manufacture and sale of lamp and carbon black and of printing and lithographing inks. The business had been founded in 1804. Petitioner was employed by Pennsylvania as president and general manager from November 30, 1933, until December 1, 1948, under an employment contract executed on June 28, 1934. Under this contract, petitioner's compensation was fixed at $20,000 to $25,000 per year, the exact amount to be fixed within those limits by the board of directors, plus 25 per cent of the net profits before taxes. The contract had a five-year term, *77 but was renewable indefinitely for additional five-year periods at the option of petitioner, as long as the company should show a profit before taxes of at least $150,000 for the five-year period immediately preceding. The death of petitioner, or any incapacity on his part to perform his functions, was automatically to terminate the agreement. Petitioner renewed the contract for several successive five-year periods. The last such renewal took place on November 30, 1948. On January 2, 1947, Pennsylvania and two financial institutions entered into an agreement resulting in loans to Pennsylvania aggregating $1,000,000. This sum was to be repaid in quarterly installments of $50,000, the final installment due June 30, 1952. The agreement also provided that total payments to petitioner as compensation for services, during the period January 2, 1947, to June 30, 1952, should not exceed $65,000 per year. Pennsylvania had purchased an uncompleted carbon black plant at Eunice, New Mexico, from an agency of the United States Government. Its purpose in borrowing the foregoing sum was to complete the plant. The loan was finally liquidated in 1950 by Charles Eneu Johnson, Inc. (hereinafter called *78 "Delaware") with funds advanced by United Carbon Company (hereinafter called "United") through a new stock purchase. At the time of the making of the above loan Pennsylvania was also operating a plant at Monument, New Mexico, which it rented from the Defense Plant Corporation, an agency of the United States. The Government was then offering that plant for sale, and Pennsylvania had submitted a bid. Another plant, at Stonewell, Oklahoma, was sold by Pennsylvania in 1947 or 1948 when its gas supply became exhausted. On January 10, 1947, petitioner and Pennsylvania agreed, in contemplation of the foregoing loan agreement, that until June 30, 1952, total annual compensation currently payable to petitioner should in no event exceed $65,000. Any excess due petitioner under his employment contract was to be paid in twenty equal quarterly installments commencing July 1, 1952. Petitioner's brother, J. Smiley Herkness, during his lifetime had been president, a director and the principal stockholder in Pennsylvania. He died on November 30, 1933. Alice W. Herkness, his widow, elected to take against the will and received half of the stock owned by her husband at his death. J. Smiley Herkness *79 had at one time been sole stockholder, but he disposed of a small part of the total prior to his death through various inter vivos gifts. Petitioner, who had been general manager and vice-president, received no shares in Pennsylvania under his brother's will. He had no written employment contract prior to the death of his brother. Thereafter, in order to assure himself that he could not be fired as long as he continued to manage the business competently, he insisted that a written contract of employment be executed. Such a contract was negotiated between petitioner on the one side and the widow and trustee of the estate on the other. The contract, executed in 1934, related back to the date of the death of J. Smiley Herkness. In 1948 and prior thereto petitioner became interested in purchasing the stock of Pennsylvania. He endeavored unsuccessfully to borrow the necessary funds from a bank. During 1948 the demand for carbon black far outstripped the supply. The manufacture of carbon black requires a plentiful supply of gas at low prices, which Pennsylvania then had. Petitioner conceived the idea that he might be able to borrow from one of the larger manufacturers of carbon black *80 the funds necessary to effect a purchase of the stock of Pennsylvania. He believed that he could induce the making of such loan if he should agree to sell to the lender at a discount the carbon black produced by Pennsylvania. The shortage of carbon black was felt with particular acuteness by United. Its gas supply had been curtailed in one plant, and in another the price of gas was too high. In July or August of 1948 petitioner commenced negotiations with Oscar Nelson, president of United for the purpose of obtaining the desired loan. Petitioner and Nelson had been business acquaintances of long standing. They were both on the board of directors of CarbonBlack Export Company. During 1948 they discussed several different times the possibility of a loan by United to petitioner individually for the purpose of enabling him to purchase all the stock of Pennsylvania. An audit of the books of Pennsylvania was made by United's accountants. The results of this audit were received by United on August 11, 1948. Thereafter, Nelson agreed that United would lend to petitioner up to $2,500,000 for the above purpose. The deferred compensation due petitioner was on the books of Pennsylvania and *81 had been reflected in the audit. On July 30, 1948, an Executive Committee meeting of United was held. A resolution was adopted authorizing United to guarantee to the previously mentioned financial institutions the repayment of the amount of $800,000 still owing to them from Pennsylvania. A guarantee was executed on the same day in conformity with that resolution. The purpose of the guarantee was to induce the creditors to permit Pennsylvania to incur an indebtedness in favor of the War Assets Administration for the purchase of the foregoing plant at Monument, New Mexico. The benefit expected by United was the execution after such purchase of a contract between Pennsylvania and United Carbon, Inc. (Maryland) (hereinafter called "Maryland"), a wholly owned subsidiary of United, respecting the sale of carbon black to be manufactured at that plant. However, the purchase of the plant was never consummated, and the guarantee became inoperative for that reason, in accordance with its express terms. Before it became known that Pennsylvania would not acquire the plant at Monument, New Mexico, appropriate resolutions supplementing the above resolutions of United had been passed on August 14, 1948, by *82 the board of directors of Maryland. One such resolution had authorized an agreement with Pennsylvania whereby Maryland would act as agent for the sale of the carbon black production of Pennsylvania for a period ending January 1, 1958. Another authorized the making of a loan to Pennsylvania, and still another authorized an offer to purchase the plant at Monument, New Mexico, from Pennsylvania should the bid submitted by the latter be accepted. Petitioner then commenced negotiations with the stockholders of Pennsylvania for the purchase of their stock. On or about November 3, 1948, the outstanding stock of that company consisted of 4,000 shares held as follows: Percentage
Shareholder
No. of Shares
of total
Girard Trust Co.
1,770
44.25
Alice W. Herkness
1,770
44.25
James J. Hagan
20
.50
Dorothy Martin Saylor
20
.50
Louise Johnson Young
20
.50
Lindsay C. Herkness
3
.075
Lindsay C. Herkness, Jr.
10
.25
Carlota L. Herkness
387
9.675
Totals
4,000
100%
The Girard Trust Co. was the trustee under the will of J. Smiley Herkness. Alice W. Herkness was his widow. Carlota L. Herkness and Lindsay C. Herkness, Jr., are the wife and son, respectively, *83 of the petitioner. Dorothy Martin Saylor and Louise Johnson Young were distant cousins of Alice W. Herkness. James Hagan was an employee of Pennsylvania and not otherwise related to any of the other stockholders. On November 3, 1948, Girard Trust Company wrote to United offering to sell 3,540 shares in Pennsylvania. These were the shares held by Girard Trust Company and Alice W. Herkness. United replied on November 5, 1948, to the effect that it was not interested in any proposal covering less than all outstanding shares. The shareholders desired to sell because dividend payments were then quite low. They were attempting to sell at a price greater than that at which petitioner had offered to buy. On November 8, 1948, the Girard Trust Company contacted petitioner by letter, inquiring whether his wife would be willing to join with the other stockholders in a sale of their stock in Pennsylvania to United. The foregoing business activities of the widow and trustee had by this time caused some degree of deterioration in the relationship between petitioner and his sister-in-law. Petitioner resented her efforts and those of the trustee to solicit a sale of their stock to United at the *84 same time that petitioner was attempting to borrow funds from United so that he might be enabled to purchase that stock. Accordingly, petitioner's wife declined to join with the other stockholders, and she so advised the trustee. A meeting of the board of directors of United was held on November 10, 1948. A resolution was passed approving a loan of $2,500,000 to a Delaware corporation to be formed for the purpose of acquiring all shares of the capital stock of Pennsylvania. The resolution provided for appropriate restrictions upon the payment of dividends and salaries, transfer of capital assets, and incurring of other indebtedness on the part of the prospective debtor corporation. On the same day, at a meeting of the board of directors of Maryland, a resolution was adopted authorizing a contract between Maryland and Pennsylvania respecting the purchase of the carbon black production of the latter for a ten-year period at a discount of ten per cent. Petitioner organized Delaware on December 14, 1948. He received all of its capital stock, consisting of 3,050 shares, for a total consideration of $15,250. That sum constituted petitioner's total investment in Delaware. Petitioner became *85 president and sole stockholder. One of his sons became secretary and a director and his brother, Wayne Herkness, was also constituted a director. The purpose of the formation of Delaware was to borrow funds from United and to acquire all of the capital stock of Pennsylvania. It had no other purpose, and was looked upon merely as petitioner's corporate depository of Pennsylvania stock. Its only asset was the $15,250 cash paid in by petitioner. On December 17, 1948, a meeting of the board of directors of Delaware was held relative to a proposed loan of $2,500,000 from United. The purchase of the stock of Pennsylvania was authorized at a price of $562.50 per share. By agreement dated December 21, 1948, United agreed to lend to Delaware up to $2,500,000 for the purpose of acquiring the stock of Pennsylvania. Current annual payment of compensation to petitioner by either Delaware or Pennsylvania was limited by the agreement to a maximum of $65,000, from January 1, 1949, to December 31, 1957. United also agreed to enter into a purchase and sale agreement with Pennsylvania covering the latter's entire domestic production of carbon black. Accordingly, United made a loan of $2,500,000 *86 to Delaware, which executed an unsecured installment note in that amount, payments to commence March 31, 1952. In December of 1948 Delaware purchased 3,980 of the 4,000 outstanding shares of stock in Pennsylvania for a total consideration of $2,238,750. Early in 1949 it acquired the remaining 20 shares for approximately $18,000. The purchase of this stock was made with the funds lent by United. Pennsylvania thus became the wholly-owned subsidiary of Delaware, all of the stock of which was in turn owned by petitioner. On January 21, 1949, Pennsylvania agreed to sell to Maryland all of its domestic output of channel carbon black. Maryland agreed to purchase such output at the current domestic price less ten per cent. United guaranteed performance of the contract on the part of Maryland. On February 11, 1949, petitioner's employment contract with Pennsylvania was cancelled by mutual agreement, effective retroactively to January 1, 1949. A new agreement was substituted therefor, providing, inter alia, a fixed annual salary of $65,000. Petitioner had been advised by counsel that because of the relationship between Delaware, Pennsylvania and himself, Pennsylvania would not be entitled *87 to any deduction in respect of the deferred compensation even though such amount should be actually paid to him in the future. This agreement, however, saved to petitioner his rights under the old agreement in respect of amounts due him as additional compensation for the years 1947 and 1948. On June 23, 1949, a special meeting was held of the board of directors of Delaware. A plan to merge Pennsylvania into Delaware was then approved. The merger approved at that meeting took place on June 30, 1949, and the outstanding stock of Pennsylvania was then cancelled. Prior thereto, on June 28, 1949, United had agreed to subordinate its claim for the loan to Delaware in the amount of $2,500,000. This action on the part of United was in fulfillment of a commitment it had made by letter of December 16, 1948. During 1949 the new corporation was successful, all financial obligations were met, cash balances were built up, and the company paid an initial dividend of $30,000. In 1949 petitioner visited Europe. While in Scotland he had a severe heart attack. He was told, among other things, that he should have his affairs in such shape that if he died there would be no cause for embarrassment to *88 his heirs. He returned to the United States in October of 1949. On December 17, 1949, United received a report from its accountants on the financial condition of Delaware as of September 30, 1949. Following considerable bargaining over price with Nelson, petitioner offered to sell the stock of Delaware for $429 per share, or a total of $1,308,450. This offer was accepted December 20, 1949, subject to approval of the board of directors of United. Approval was obtained at a directors' meeting held on December 29, 1949. On December 30, 1949, petitioner received the sale price of $1,308,450 from United, but continued to function as president of Delaware. The total amount of deferred compensation due petitioner in respect of 1947 and 1948 was $157,396.38. In a letter of December 21, 1949, petitioner expressed a willingness to permit Delaware, the successor into which Pennsylvania had by then been merged, to anticipate the payment of that indebtedness at a discount of six per cent per annum. This was estimated to require the payment of approximately $108,000. Anticipation was made, and petitioner received the sum of $107,258.14 from Delaware in full discharge of his claim for deferred *89 compensation in respect of the years 1947 and 1948. As of December 31, 1949, an examination of the books of Delaware and its subsidiary was made for United by its accountants. In the audit statement there appears to be a write-up of assets under the item of "capital stock and surplus" by means of a re-evaluation of fixed assets without appraisal. An analysis of Pennsylvania for 1947 and 1948 and of Pennsylvania and Delaware for 1949 shows that sales to United rose from.11 per cent of total sales in 1947 to 53.10 per cent in 1949. An analysis of the profits of Pennsylvania before taxes shows the profit before taxes and the 25 per cent additional compensation due petitioner under his old employment contract for the fiscal years 1934 through 1948 to have been as follows: Profit
before taxes
Additional
Year ended
and additional
compensation
November 30
compensation
25%
1934
$148,151.87
$ 37,037.97
1935
159,117.44
39,779.36
1936
179,881.74
44,970.44
1937
164,270.42
41,067.60
1938
49,961.07
12,490.27
1939
136,326.22
34,081.55
1940
172,048.50
43,012.12
1941
154,883.28
38,720.82
1942
70,548.73
17,637.18
1943
120,457.65
30,114.41
1944
73,992.11
18,498.03
1945
161,914.17
40,478.54
1946
253,473.23
64,618.30
1947
536,265.06
134,066.27
1948
616,459.91
154,114.98
Totals
$3,002,751.40
$750,687.84
*90 Petitioner and his wife, in their joint income tax return for 1949, reported a sale of 3,050 shares of stock of Delaware at a price of $1,308,450. A cost basis of $15,250 and expenses of sale in the amount of $244 were claimed. The net gain of $1,292,956 resulting thereby was reported as a long-term capital gain. Respondent, in his notice of deficiency, has included the entire sum of $1,308,450 as ordinary income. His contention is that such sum was in fact received by petitioner as consideration for the cancellation of the original contract of employment, particularly the release of the right to 25 per cent of the profits. The sum of $1,308,450 received by petitioner in 1949 from United was in fact the selling price of his stock in Delaware. The stock so sold was a capital asset, and had been held at the time of sale for a period in excess of six months. The sum received, less petitioner's basis and selling costs, constituted a long-term capital gain. Opinion RAUM, Judge: No question of law is presented by the instant proceeding. The sole issue is one of fact, whether an amount received by petitioner constituted the sale price of corporate stock as claimed by petitioner, or, *91 as contended by respondent, consideration paid for the cancellation of an employment contract. The long procession of factual events leading up to the disputed transaction has already been set forth in the foregoing findings of fact. No purpose would be served by a detailed repetition here of the facts involved. In summary, the petitioner had been president and general manager of a corporation for a number of years. His contract of employment entitled him to 25 per cent of the profits before taxes. For valid business purposes, it became necessary to limit the amount currently payable to petitioner for a fixed number of years, prospectively. Subsequently, having been advised that a deduction would be denied to the corporation for amounts accrued and payable to him at a future date but not payable currently, petitioner and his employer entered into a new contract of employment which entitled petitioner to a fixed salary only, currently payable in full, but with no provision for a share in the profits. Almost a year thereafter petitioner transferred to another corporation all of the shares of the former parent corporation of his employer into which the original employer corporation *92 had by then been 4erged, and received the payment in question here. Petitioner's testimony has been forthright and convincing. It is consistent with his theory of the nature of the payment and with all other evidence that has been introduced. We are of the opinion that petitioner has adequately carried his burden of proof, and that the prima facie correctness of the determination made by the respondent has been overcome. The respondent, on the other hand, has introduced no evidence tending either to support his theory or to discredit that of the petitioner. We find nothing elicited upon cross-examination that tends to weaken in any way the evidence, more than adequate both in quantity and quality, upon which petitioner rests his case. In effect, respondent asks us to disregard the record before us and to infer existence of a factual state which has not been proven to exist, and which in many essential respects is directly opposed to that which arises from a reading of the entire record. No reason appears to exist justifying such a request, except that respondent is suspicious that the true state of affairs is other than that which is apparent from the evidence before us. In these *93 circumstances we cannot indulge in such speculation. We are bound by the record made by the parties and must decide the case on the basis of what actually is to be found therein. Respondent states generally the well-established rule that form will not prevail over substance, but fails to show the substance of the transaction at issue here to be other than as claimed by petitioner, and as borne out by competent evidence. Respondent alludes to the valuable nature of petitioner's right to a share of the profits of Pennsylvania. Undoubtedly this right had great value. But it was cancelled in February of 1949, whereas the transaction attacked by respondent occurred in December of that year. Conceivably, such transactions, although separate in time, could in fact be integral parts of a single over-all plan. But here the transactions appear to be quite unrelated. Theoretically, of course, all or a substantial part of the amount involved might have been received in December of 1949 as consideration for the relinquishment earlier in the year of petitioner's contract of employment, the entire transaction having thus been planned in advance. We mention this merely as a possibility. Petitioner's *94 evidence alone, however, is to the contrary, and it is convincing. We have no countervailing evidence. The evidence introduced by petitioner stands unimpeached, and we must find in accordance therewith. Respondent has not challenged the correctness of the amounts claimed by petitioner as his basis and selling expenses. Since we have found as a fact that the sum of $1,308,450 was received for capital stock, which constituted a capital asset held for a period in excess of six months, the gain from such sale, in the amount set forth in the return, was correctly reported as long term capital gain. For the foregoing reasons we have concluded that the respondent erred in determining that the sum of $1,308,450 received by petitioner in the calendar year 1949 constituted ordinary income. Decision will be entered under Rule 50.